MEMORANDUM OF DECISION
On December 2, 1998, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Bernice McF. and Maurice B. to their two children, Moenisha and Maurice. The petitions were amended on February 10, 2000. The trial was held on April 24 and 25, 2000. Bernice McF. did not attend the trial. She had signed consent forms to the termination of her parental rights to her two children. Because she was not present to be questioned by the court concerning her consent, the trial proceeded in her absence. Maurice B. attended the trial and through his counsel contested the petitions.
For the reasons set forth below, the court grants the termination petitions as to both parents on the grounds that each has failed to rehabilitate as parents of these children. Further, the amended petitions allege Bernice's abandonment of them as well as the fact that neither parent has an ongoing parent-child relationship with them. The court grants the petitions on the amended grounds as well, based on the clear and convincing evidence, as set forth below. Connecticut General Statutes Section 17a-112 (c)(3)(A), (B), and (D).
From the evidence presented, the court finds the following facts:
 A. FACTS
Moenisha and Maurice were first removed from their mother in August, 1994, due to her abandonment of them because of her significant and CT Page 5746 ongoing substance abuse. They were returned to her care under protective supervision for a number of months, before they were removed again in February, 1994 under an order of temporary custody. They were adjudicated neglected children on March 30, 1995 and committed to the care and custody of the Commissioner of DCF. Their commitment has been extended several times since that date.
Maurice B., their father, was incarcerated from 1994 to 1998 and was not involved in their lives, although he had ongoing visitation with them both in prison. Their mother was referred to significant numbers of substance abuse treatment centers to address her substance abuse.[2]
However, it was not until November 19, 1996 that she received inpatient treatment services at Connecticut Valley Hospital for forty-five days. Thereafter, she received further inpatient treatment at Liberation house until May 27, 1997, at which point she was discharged. She refused then to move on to a transitional home, but participated in outpatient services until October 27, 1997, when she again tested positive for cocaine.
Expectations were set by the court for Bernice on two different occasions, on September 7, 1994 and then again on March 30, 1995. On September 23, 1997 DCF and Bernice entered into a written service agreement. Bernice was never able to comply with any of the expectations or the service agreement. She did not visit the children regularly and was often whereabouts unknown. As previously found, she was unable to remain substance free.
1. Bernice McF., the mother.
Bernice is now thirty years old. She is the mother of six children. At the present time, her youngest child, now twelve months old and her oldest child, who is thirteen years old, are living with her. Her rights to two children younger than Moenisha and Maurice were terminated. Her interactions with her two children, Moenisha and Maurice, have been minimal at best. During a parent-child interaction session conducted by the court-appointed psychologist Dr. Barbara Berkowitz, Dr. Berkowitz noted that "there was little or no affection observed from mother to children or children to mother. The extent of any attachment was certainly unclear."[3] She also observed that the children, during the course of the session, looked more to her, the evaluator, than their mother, for direction and feed back as to what they were doing. The DCF social worker also reported the same observations during visits. Bernice was unable to manage these two children and did not interact with them. She noted "she shows little interest in them during visits." There have been no visits with the children since August, 1998. Bernice did not send cards, gifts or letters to her children and did not inquire about CT Page 5747 their well being.
Bernice does not advance any serious claim that either Moenisha or Maurice should be returned to her care. During the evaluation, she indicated she believed the children were best placed with their current foster mother and that she was then seriously considering consenting to the termination of her parental rights. Her counsel indicated at the time of trial Bernice was very resistant to coming to court. In all the time she had represented her, Bernice only came to court once or twice, early in the neglect proceedings. Despite awareness of her preferences, arrangements were made to transport Bernice to the trial, but she failed to take advantage of those arrangements and, as noted, did not attend.
2. Maurice B., the father.
The children's father, however, is seeking to have both children returned to his care. He vigorously contested the termination petitions. He is now thirty-five years old, released from prison and only marginally employed performing occasional landscape work. He himself spent the majority of his childhood in DCF care. He was placed in several residential facilities and in a foster home. Much of his adult life has been spent incarcerated and he is a convicted felon. His criminal record reveals many convictions; for possession of marijuana with intent to sell, burglary in third degree, robbery in the first degree, possession of cocaine, possession of narcotics, reckless endangerment and assault in the second and third degree as well as a violation of probation conviction, for which he served time in 1998.
Initially, the DCF plan was to reunify the children with their mother. When it became clear that she would or could not rehabilitate herself with respect to the children, DCF was willing to consider the father as a resource for the children. Maurice and DCF entered into a service agreement on October 1, 1996. In that agreement Maurice agreed that he would abide by the rules and regulations of the Department of Corrections, participate in the GED program, cooperate with DCF, work with Families in Crisis and continue any employment permitted by the Department of Corrections. All went reasonably well until Maurice's B's release from incarceration in the spring of 1998. Prior to that time, Maurice had participated in the GED program, although he was unable to pass the test to secure his diploma. He did cooperate with various programs while incarcerated, including an anger management course, parenting courses as well as individual counseling. Maurice had monthly visitation in prison from 1994 to 1998, when he was released. The DCF social worker testified that there was not much opportunity for interaction and play during those visits, as the situation was carefully circumscribed in the visiting room at the facility. She noted that: CT Page 5748
 "regularly scheduled prison visitations simply have not and cannot provide the basis for a re-establishment and/or maintenance of normal parent-child bonds. Incarcerated parents, due to the circumstances of prison life, cannot provide the daily physical, emotional, moral or educational support required by their children."[4]
DCF was supportive of Maurice's position during the time of his incarceration and even on several occasions wrote to the Department of Parole on his behalf, stressing the various steps he had taken to address his own difficulties and to establish connections with his children.
Nonetheless, there was a limit to Maurice's willingness to do what was expected of him during his period of incarceration. On January 8, 1997, he acknowledged in writing while at the Willard Correctional Institute that he was refusing to address his educational needs at that time. He also knew, as set forth in the form, that his refusal might have a negative effect on his furlough and his parole. In addition, he understood that this refusal would have an impact on the prison employment opportunities available to him.[5]
Upon his release from incarceration in March, 1998, DCF established visitation for him through the Children's Center. This center provided supervision of the visitation by a clinical therapist, Ms. Staratt, who had been working with the children dealing with behavior issues that they had within the foster home. Ms. Staratt testified at trial concerning the visitation, which took place in the next several months at the center. She told of the two children's specialized needs. Moenisha frequently engaged in verbal acting-out, tantrums, crying, sexual activity and was on occasion hospitalized at St. Raphael's Hospital. Maurice, the child, also had specialized needs. He was in a special school, aggressive, out of control, running and hitting and at one point, after the first visit with his father, taking his feces and putting it in the dinner casserole in the foster home.
When the visits away from the prison began, Moenisha was six years old and Maurice was almost five years old. Ms. Staratt testified the center supervised seven visits between the children and their father between April 1998 to June 1998. Those visits were to occur weekly. They happened at the center two or three times and then moved outside to a park. Moenisha was interested in being with her father in the beginning and Maurice would begin the sessions in "good shape and end it in conflict." She noted that their father did want to be there with them, CT Page 5749 but she observed that "there was a piece missing, an emotional connection." Maurice was twenty minutes late for the second visit. During that visit, Maurice acted out and his father did not know how to handle the child. The third visit was in the park. During this visit, there was very little interaction between him and the children, as he watched them play in the play area. The fourth visit again took place in a local park. Maurice arrived with some baseball equipment and a jump rope. This time, he played with both of his children and had planned what he might do with them. At that point on May 14, 1998, the worker inquired as to his plan to have unsupervised visits. He did not comment and appeared not have considered this or made any plan.
Unfortunately for Maurice, his visitation efforts went down hill after the fourth visit. He was forty-five minutes late for the next visit and his explanation, "hey, things happen," did not present a plausible excuse. Again, he was distant from the children and did not play with them. At the last visit on June 11, 1998, Maurice arrived one hour late. He did not appear to know where the children were playing and then watched them at play, while speaking for about twenty minutes on his cell phone. Maurice canceled the next visit and when calls were made for the following visit, there was no answer. Later it was discovered after June 24, 1998 that Maurice had been incarcerated for a probation violation.[6]
A review of the progress of these visits indicates a father, perhaps well intentioned, for whom the demands outside the structured setting of a prison environment were accelerating and distracting his focus and attention away from his children. As the visits progressed, he seemed less able to connect and interact with his two children. Certainly, he did not approach each visit in a planned way, considering what was necessary for each of his children. When Maurice was contacted in prison, he did not arrange for further visitation there as he expected to be released quickly. When Maurice was released from incarceration in November, 1998, in view of the problems the children were experiencing and the recommendation of the therapists and psychiatrist managing the children's problematic behaviors at the Children's Center, visitation was not resumed.
On October 1, 1998, the children's psychiatrist wrote to DCF, recommending that no visits be arranged for Maurice B. with his two children. In her opinion:
 "contact would only further disrupt and disturb these children. They do not have the capacity to separate what happened in the past and the safety of the present. Moenisha, in particular, struggles with CT Page 5750 flashbacks and horrifying memories of what happened in the past. Maurice becomes more disorganized and bizarre in his behavior."[7]
Visitation did not resume again until after a court hearing in June, 1999, directing that it recommence. Between August, 1999 and the present time, there have been approximately five visits. In March, 2000, visitation was set for weekly supervised visits at a clinic established by Southern Connecticut State University, again with therapeutic assistance and intervention. The first visit had taken place only a week before the trial began. Prior to the commencement of the visitation, DCF entered into a second service agreement with Maurice, dated March 3, 2000 concerning those visits and his future conduct.
On March 25, 1999, Dr. Berkowitz performed a psychological evaluation of Maurice B. When she asked him what services would be helpful if the children were reunified with him, his response was: "Truthfully, I do not think I need any services. You can't really learn how to be a mother or father. With mothers, it is something they just do." He seemed surprised when Dr. Berkowitz suggested that some mothers do not know how to care for the children. In Maurice's opinion, he believed that he had complied with all conditions that had been imposed upon him by DCF and the court. He thought it was in the best interests for the children to be with him, even though he admitted they were well-cared for in their present foster home. Dr. Berkowitz noted "our discussions reflected his lack of insight into any effects on the children from having been in foster care for so long, or of his significant absence because of incarceration. He seemed to perceive children as static objects instorage, to be reclaimed when the owner is ready." (emphasis added.)[8]
She observed that "Maurice had contributed to his children's special needs, by virtue of his inability to remain a free man and to responsibly work to support his children."
Dr. Berkowitz, like the children's therapist, also noted Maurice's distance from the children. He did not seem to know how to interact more closely with them or to control them when they were misbehaving. She concluded that he lacked sound parenting skills. "Unfortunately, he had rejected the idea that he could use assistance and learning in this area. He was much more imbued with the abstract concept of fatherhood than with actually carrying out the parental role. He did not seem to know how to act like an authority figure, nor did he know how to get down and play comfortably with his children. He . . . seemed to want them to meet his needs rather than meeting theirs."
When Dr. Berkowitz testified in court, she was unequivocal that termination was in the best interests of the children. She also noted CT Page 5751 that the foster mother was willing to permit limited contact post — termination between the parents and the children. Given the ages of the children, she believed that this was in their best interests and recommended such contact for the benefit of the children and their future adjustment. It would best be done, in her view, by a limited number of letters, cards and gifts and infrequent face-to-face contact during the year. The children could maintain a connection to their family of origin and such limited contact would not undermine the foster mother's parenting authority. Dr. Berkowitz also concluded that Maurice D. was not likely to partake of or benefit from services and did not perceive that he had need of services, even for himself to deal with his own personal issues concerning his childhood. Most important was that Maurice D. did not understand the significant personal needs of the children nor their individual characteristics.
Maurice testified at trial and the court was able to assess his behavior and character as well. From the testimony, the court concludes that it was apparent how little Maurice actually did comprehend about the interactions between parents and children. He complained that he had never been given the opportunity to reunify with his children. As has been noted:
 "it is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct." Dario v. Dario, 123 Conn. 88, 92, 192 A.2d 557 (1937).
And the court concludes, based on the testimony, that Maurice has not begun to make the required personal changes, which would permit him to parent his children. It would take, given the children's varied and specialized needs, considerable and well-developed parenting skills to parent these children. From the evidence, the court concludes that Maurice did not possess more than rudimentary parenting, skills and that, given the level of counseling required for him to make personal progress, much more assistance was needed. He does not acknowledge such a need and does not appreciate that the visitation at the Children's Center provided him with the opportunity both to learn and demonstrate his commitment to his children in real and tangible, rather than imagined, ways. The court concludes, both from the opinions of the experts and from its own ability to observe and weigh Maurice's demeanor, that he does not understand his own contribution to his children's present plight or their considerable special needs. Further, he lacks an appreciation of what it is that must be done to adequately parent them.
3. The children, Moenisha and Maurice B.
CT Page 5752
Moenisha is now eight years old and Maurice is seven. The children have significant special needs. Some of their behavior has been described above. Their mother used cocaine regularly during the time she was pregnant with each of them. Each was born with a positive screen for the drug in their system. Such in utero exposure to tetrogenic substances has had its impact upon their development, not to mention their chaotic lives with a mother who, due to drug use, was emotionally unable to care for them and nurture them in their early years. In October, 1999, the Children's Center corresponded with the DCF social worker, requesting a full PEDAL evaluation of all four children then in DCF care, including Moenisha and Maurice. The children's' therapist summarized their problems and stated:
 "Many of the symptoms/behaviors displayed by the B./McF. children are quite similar and seem to emerge when the children reach four or five. Three or four of the children engage or have engaged in the following behaviors: difficulty going to sleep, overeating, significant aggression directed at all ages, oppositionality and low level or no remorse/conscience."[9]
Ms. Popkin goes on to describe the children's significant individual psychiatric and educational issues. "Moenisha struggles with anxiety, attachment, flashbacks, dissociative episodes and learning disabilities. Maurice struggles with attachment, disorganized behavior, impulsive, disruptive behavior and enuresis." Both Moenisha and Maurice are seen by the Center's psychiatrist to monitor their "psychotropic medications. Moenisha is taking Risperdal and Clonidine, Maurice is taking Risperdal. . . ." Both children have required psychiatric hospitalizations.
Unfortunately, for the children, the disruptive life experiences did not end for them when they were placed in foster care. Their first foster care placement lasted for two years, during which time they were subjected to inappropriate physical discipline and Moenisha may have been sexually abused. DCF acted promptly to remove the children and to terminate the foster care license of the individuals in question, thereby preventing further abuse from occurring. Nonetheless, such action cannot erase the continued trauma these children have experienced. It also illustrates that society in general cannot assume. that its well-meaning actions, taken in the name of the best interests of abused and neglected children, necessarily and always create the desired improvements in the personal circumstances of such vulnerable children. In many ways, these children are voiceless, as they cannot yet speak with a voice that can easily be heard by those in authority. Their CT Page 5753 continued abuse while in the care of the state only serves to demonstrate the need for greater vigilance on the part of all those whose duty it is to prevent such events.
The children's present foster mother testified at trial. She is in the process of adopting the two younger half-siblings of Moenisha and Maurice. She would like to adopt Moenisha. and Maurice. During her evaluation session in 1999 with Dr. Berkowitz, she spoke about the many difficulties with all of the children and in particular about Moenisha and Maurice. When Moenisha first came, she was sad. The foster mother suspected sexual molestation because Moenisha was so knowledgeable about sexual matters. She also was dangerous to herself. For example, she would run across the street and dart out in front of cars, anything unsafe that she could do. Her attitude was "I don't care. She had an aggressive attitude, too, and could use every profane word you could think of and use it correctly, too. If she got her needs met, she was through with you . . . Extremely clean, took good care of her clothes. She would destroy your things, but not hers."
Maurice, she reported to Dr. Berkowitz, had very poor motor skills when he first came. She described him as the most needy of the three children she had then, totally uncoordinated and accident-prone. "He didn't know how to run, wasn't toilet trained yet. He knew how to go, but wouldn't go. He played with his feces and used to have screaming tantrums, lasting hours." She described a game, which the children played, in which the children stood in a circle, hitting and clapping and kicking each other. Another pastime was trashing their rooms.
These behaviors have improved over time, although significant challenges remain. The DCF social worker noted that the two children are attached to their foster mother and that she has done a tremendous job with them. "These children would try the patience of any other adult. She has it for days, but knows how to soothe them and calm them down. Moenisha has a tremendous bond with her and looks for approval from her. Maurice also does this, responds to consequences." The DCF social worker testified that he had observed situations when Maurice was unable to verbalize what was troubling him, but his foster mother was able to calm him down quickly, In his opinion, the children saw their foster mother as the psychological parent who takes care of their needs. Dr. Berkowitz also noted the strong bond that exists between the children and the foster mother.[10] She believed that the best interests of the children would be served in remaining with this foster mother and being adopted by her. The DCF worker and the Children Center's psychiatrist echoed this view and believed that permanency and stability of care was crucial for both children soon. CT Page 5754
 B. ADJUDICATORY FINDINGS 1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent unless the court finds in this proceeding that the parent is unable or. unwilling to benefit from reunification efforts . . . provided that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes Section 17a-112
(c)(1). The amended petitions of February 10, 2000 allege that both parents are unable or unwilling to benefit from such services. Further, the court also made a finding that further efforts were not required on August 28, 1998.
Connecticut General Statutes Section 17a-112 (a)(1) does not contain within it a definition of the term "reasonable." The Connecticut Court has held that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2nd Ed.). State v. Antrim,185 Conn. 118, 122 (1981) (citations omitted). More recently, in the termination of parental rights context, the Appellate Court stated that reasonable efforts means doing everything reasonable, not everything possible." In re Savanna M., 55 Conn. App. 807, 812-813, ___ A.2d ___ (1999) (citations omitted); In re Jessica B., 50 Conn. App. 554, 566,718 A.2d 997 (1998).
The court finds, from the clear and convincing evidence, that DCF made reasonable efforts to reunify both Bernice McF. and Maurice B. with their two children. Bernice received numerous referrals to deal with her substance abuse problems, which she was unable to do. She also has evidenced no interest in these two children since 1998, when the court concluded that further efforts were not required. Given her behavior, the court also concludes that she was both unwilling and unable to benefit from the reasonable reunification efforts that were made on her behalf.
Maurice B.'s counsel argues that DCF did not make reasonable efforts for him and that it prevented him from visiting with his children for a substantial length of time between November 11, 1998, when he was last released from incarceration and August of 1999, when his visitation with his two children resumed on a monthly basis. This contention overlooks his performance with his children when he was offered regular, therapeutically supervised visitation with Moenisha and Maurice at the Children's Center in the spring and early summer of 1998, which the CT Page 5755 professionals hoped would lead to unsupervised visitation and reunification. The record of that 1998 visitation reflects that the longer Maurice was on his own, the less he was able to focus on his children. Further, it is his own voluntary conduct, which once again removed him from his children's daily lives, when a probation violation resulted in his re-incarceration for a period of months.
2. Bernice McF.'s Abandonment of the Children.
The court concludes from the clear and convincing evidence, that as of February 10, 2000, Bernice had abandoned these two children, Moenisha and Maurice. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 14,438 A.2d 801 (1981). Bernice had not visited them since August, 1998. She has not sent cards, gifts or letters to them. She has also not inquired about their welfare, either through the DCF social worker or the foster mother, who was willing to interact with her.
3. The Parents' Failure to Rehabilitate
On March 30, 1995, both Moenisha and Maurice B. were adjudicated neglected and committed to the care and custody of DCF. Their commitment has been extended since that time. The court further finds, by clear and convincing evidence, that as of the date of the amendment of the termination petitions on February 10, 2000, neither parent had achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, they could assume responsible positions in the children's lives. Connecticut General Statutes Section 17a-112 (c)(3)(B). "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent."In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986), see alsoIn re Juvenile Appeal, 1 Conn. App. 463, 477, 473 A.2d 795 (1984). The evidence clearly demonstrates that neither parent has taken the steps necessary to parent the children.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time."In re Luis C., 210 Conn. 157, 1167, 554 A.2d 722 (1989), In re HectorL., 53 Conn. App. 359, 366-367, ___ A.2d ___ (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only the parents' conduct prior to the filing of those CT Page 5756 petitions, but also their conduct since that time; in this case after February 10, 2000. There is no evidence that Bernice has taken any further steps. She is not interested in parenting these children and believes that they are best left with their foster mother.
Maurice B., other than his continued interest in visitation and his own belief that he would be able to parent these children within the next six months, also has done nothing to bring himself closer to rehabilitation. There is no evidence of the completion of further parenting classes, counseling for himself or other steps to enhance his parenting. While it is the case that visitation is now ongoing with therapeutic support, the court itself had an opportunity to observe his thinking about parenting and his understanding of his children's needs on the day of his testimony on April 25, 2000. The court also listened to his evasive answers about his employment when he was questioned about the ways in which he was supporting himself and would support his children after reunification. The court concludes that there has been no change since Dr. Berkowitz's assessment of Maurice D. in 1999. He has not made any progress in the year since that time. The court finds, from the clear and convincing evidence, that Maurice D. has not rehabilitated himself so that he could parent either of his children in the reasonably foreseeable future, given their ages and needs for permanency.
Maurice claims that because he was not part of the cause for their removal from the home and because he did not abuse or neglect them, there is no reason they cannot be returned to his care. This argument overlooks his long incarceration and his voluntary conduct, which caused those incarcerations. While it is the case that incarceration alone cannot be a basis for the termination of parental rights, there are other factors in Maurice's life other than incarcerations which make it clear he cannot parent these children. These have to do with his ability to sustain an interest in them in any meaningful, reality — based, rather than fantasy life way, his ability to understand and plan to meet their very real special needs and his ability to provide a stable and nurturing home for them.
4. The Parents' Lack of an Ongoing Parent-Child relationship withtheir children.
The termination petitions also allege that there is no ongoing parent-child relationship between Bernice McF. and Maurice D. and their two children, and to allow further time for the development of such a relationship would be detrimental to the best interests of the children. Connecticut General Statutes Section 17a-112 (c)(3)(D). Our case law has defined this ground in the following way:
CT Page 5757 "The question is whether they [the facts] substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or re-establishment." In re Migdalia M., 6 Conn. App. 194, 211, 504 A.2d 532 (1986); In re Juvenile Appeal (84-3), 1 Conn. App. 463, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984); In re Juvenile Appeal (Anonymous), 177 Conn. 648, 670-671, 420 A.2d 875 (1979).
Bernice, as the DCF social worker testified, does not relate to her two middle children and is not interested in them. They do not look to her for guidance and control and daily care, In fact, they never speak of her, although they understand that she is their birth mother. The person who meets their day-to-day needs is their foster mother with whom they have now resided for a long time, considering their short lives. The court concludes that this ground has been proven as to Bernice McF. by the clear and convincing evidence.
Maurice B., unlike Bernice, remains interested in his children and wishes to be with them. They enjoy seeing him. But the visits reflect a somewhat distant relationship. The children do not look to Maurice for guidance. They do not see him as the person who provides them with the care and nurturing they require. As noted by Dr. Berkowitz, they do not pay attention to his commands. An interesting vignette was described by Dr. Berkowitz during the interactional session. The children did not believe Maurice D. when he claimed not to have a girlfriend. The actual fact of whether he did or did not have a friend is, in and of itself, unimportant. It is the children's reaction and behavior that speaks volumes. Maurice B. is someone whose statements they do not believe. As the DCF social worker indicated, the relationship is more one of a more distant relative visiting with the children, with whom they have some good times, but who is not a real presence in their lives. The court concludes from the clear and convincing evidence that there is no ongoing parent-child relationship between Maurice and his two children and to allow further time for the establishment of such a relationship would be detrimental for them.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes Section 17a-112 (e):
(1) Appropriate and timely services were provided by DCF to the family. CT Page 5758 These included services to benefit the children, referrals for Bernice to deal with issues of parenting, housing and substance abuse. DCF also provided visitation and case management services. Services, as above described, were and are being provided to Maurice B.
2) As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family until and after the date of the court order that efforts were no longer appropriate.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court has detailed the court expectations and service agreements entered into and that neither Bernice or Maurice was able to fulfill them.
4) The feelings and emotional ties of the children with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. Moenisha and Maurice are attached to their foster mother and have significant ties to her. They have none to their mother and only weak ties to their biological father.
5) Finding regarding the ages of the children: Moenisha is eight years old and Maurice recently turned seven years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. As detailed above, the court finds that the parents have not made adequate changes in their lives to accommodate the care and nurturing of these children. Bernice has done less than Maurice, but both are not in a position to care for these special needs children. Neither has demonstrated any changes that would indicate they could do so at any reasonable time in the near future, taking the ages and needs of the children into account.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the children by the unreasonable act or conduct of the other parent of the children, or the CT Page 5759 unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps for many years to encourage Bernice to have a meaningful relationship with her children and to rehabilitate herself, which she has been unable to accomplish. Further, no such conduct is noted as to Maurice B., who lacks the parenting skills to parent these special-needs children. While respondents father's counsel has argued that not permitting visitation from November, 1998 to August, 1999, was unreasonable, the court has determined, under all the facts and circumstances, that this is not so. Maurice has not used the opportunities that were available to him to learn how to parent his children. Not only does he lack such skills, he is unable to appreciate what more is needed and therefore further services cannot be expected to assist him.
 D. DISPOSITION
The court concludes, from the clear and convincing evidence, that Bernice McF. and Maurice D. cannot care for their children at the present time nor will they be able to do so in the reasonably foreseeable future. The court concludes, from the clear and convincing testimony, that it is in best interests of Moenisha and young Maurice to have permanency and stability in their lives. The court further finds that that goal can best be achieved by adoption. The children's foster mother is in the process of adopting their two younger half-siblings. She has testified to her willingness to adopt Moenisha and Maurice. Dr. Berkowitz and Dr. Gallo, the children's psychiatrist, as well as the DCF social worker believe this to be the best outcome for the children. The court agrees with their assessment. The foster mother is prepared to permit limited contact between the children and their biological parents after termination. She is to be commended for her willingness to take this step for the benefit of the children. The court concludes from the clear and convincing evidence that it is in the best interest of the children that their parents' rights to them be terminated.
The court orders that a termination of parental rights enter with respect to Bernice McF. and Maurice B. The court appoints the Commissioner of the Department of Children and Families the statutory parent for Moenisha and Maurice B. The court directs that the children's present foster mother be given first consideration in adopting the children, given the strong connection they have with her. The court further orders that a permanency plan for the children be filed and as well as a review plan, in accordance with state and federal law.
 Barbara M. Quinn, Presiding Judge Child Protection Session
CT Page 5760